IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN GIANNAROS,<br><br>                Plaintiff,<br><br>    v.<br><br>POST MEDIA, INC.,<br><br>                Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Stephen Giannaros ("Mr. Giannaros") brings this action against Post Media, Inc. ("Post"). Mr. Giannaros makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Mr. Giannaros, which are based on his personal knowledge.

**NATURE AND SUMMARY OF THE ACTION**

1. Mr. Giannaros has an eye disorder which causes vision loss as the light-sensing cells of the retina gradually deteriorate. As a result, Mr. Giannaros has very little usable sight.

2. Post is a digital news and community platform located at https://post.news/. Post has emerged as a popular alternative to Twitter. Noam Bardin, Post's founder, describes Post as a town square for civil debate, learning, and conversation.[1]

3. Unfortunately, individuals with disabilities cannot fully participate in this town square because Post is "not focused on things like . . . accessibility."[2]

---

[1] Noam Bardin, *Meet Post: A Social Platform for Real People, Real News, and Civil Conversations*, Post News (Nov. 14, 2022), https://post.news/.
[2] Noam Bardin, *What are we not working on…*, Post News (Nov. 27, 2022), https://post.news/article/2I8KY7PphGpEorYcxGJsSdGuWlC.

1

4. Post's users quickly responded to Mr. Bardin's statement announcing that Post intended to deprioritize making its platform accessible.

> I hear you. You can't do everything at once. What you all have accomplished in such a short time frame is amazing. I am impressed. But the disabled community is going to be a huge decider of who is the next 'Twitter'. Because a disabled person is more likely to be online than a person who is not, because they NEED it more. So we're not just the largest minority offline. We are a huge percentage of social media users. Because we have less social options offline we make up a greater percentage online. Social media isn't a luxury for the disabled community - it is a vital tool. Covid and the lack of masks have isolated many disabled more than they have ever been, so they go online. It's how we network, support, advocate, and learn more about living with our disabilities and swap tips and hacks. Many can't attend town hall meetings as easily or march as easily - but we can rock a keyboard very well. Consequently, many of us are writers. We use social media to be heard in a greater society that is not very accessible. – Tiah Marie Beautement

> "Accessibility" isn't a mere user preference like dark mode. And choosing not to address it is choosing to exclude based on disability. – MrJM

> As a developer, I truly do not understand the decision not to prioritize accessibility for a React application / website built from the ground up. . . . Making accessibility additive rather than an initial consideration means greater development cost later on and building tech debt way too early in the development lifecycle. To me, delaying accessibility also indicates a general carelessness within the architectural decision-making as well. – Alex Litel

> Building accessibility into the Post platform as a default community value and technical requirements from the beginning will serve you, the people using it, and your investors. Any platform that aspire to be a better, healthier space for civic discourse and journalism should be open to everyone, like libraries and schools and theaters and amphitheaters are offline. . . . I suspect a more accessible Post will also be faster and use less data, which could play a significant role in diversifying this community across regional, racial, and socioeconomic lines. – Alex Howard[3]

5. Mr. Bardin has defended Post's policies against this backlash, explaining that in "balancing the needs of the current users and the waitlisted users," Post has chosen to "not be[]

---

[3] Tiah Marie Beautement, MrJM, Alex Litel, and Alex Howard, comments, *What are we not working on…*, Post News, https://post.news/article/2I8KY7PphGpEorYcxGJsSdGuWlC.

fully accessible,"⁴ that Post "will invest in accessibility when we can,"⁵ and that Post's "number one focus is letting in the 300K+ users on our waitlist."⁶

6. Post's approach to accessibility is common among businesses. In a 2011 study entitled, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, researchers explained, "[w]ith a minority of exceptions, providing accessibility is ignored in favor of faster market entrance for a product or simply because of long-standing assumptions regarding the need for accessibility and the cost of creating accessible products."⁷

7. This exclusionary approach persists among creators notwithstanding the fact that:

> Nothing about technology makes it inherently accessible or inaccessible. Most of today's technologies are digital, meaning that they are made up of zeros and ones, and there is nothing inherently visual or auditory about zeros and ones. Digital information is not inherently accessible or inaccessible, but the choices made by those developing and implementing technology determine whether a technology will ultimately be accessible or inaccessible. This is particularly true online, given the rapid pace of technological change and introduction of new web-enabled technologies, since online technologies are often obsolete before they are made accessible.⁸

8. Mr. Giannaros files this lawsuit because Post's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Post's services, and because "[i]f people with disabilities are to move from being the most disadvantaged population online to equal

---

⁴ Noam Bardin, *This weeks focus*, Post News (Nov. 29, 2022), https://post.news/article/2IBSGspnNWL6kpz5oND8D7Bd4eX.
⁵ Bardin, comment, *supra* note 2.
⁶ Bardin, *supra* note 2.
⁷ Brian Wentz, Paul T. Jaeger, and Jonathan Lazar, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, First Monday, Vol. 16, No. 11 (Nov. 7, 2011), available at https://firstmonday.org/ojs/index.php/fm/article/download/3666/3077.
⁸ *Id*.

residents of cyberspace,"[9] we must reject the mentality of retrofitting in favor of a philosophy that emphasizes the design and development of technology that is inclusive from launch.

## JURISDICTION AND VENUE

9. The claims alleged arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

10. Post attempts to, and indeed does, participate in the Commonwealth's societal and economic life by offering and providing services over the internet to Massachusetts residents, including Mr. Giannaros. Unlike, for example, a winery that may not sell and ship wine to consumers in certain states, Post purposefully avails itself of the benefits and advantages of operating an interactive, online town square that is open 24-hours a day, 7-days a week, 365-days a year to Massachusetts residents.[10]

11. These online contacts between Post and Massachusetts residents involve, and indeed require, Post's knowing and repeated transmission of computer files over the internet in Massachusetts.

12. Mr. Giannaros was injured when (a) he attempted to access Post's online community and services from Massachusetts, but encountered barriers that denied him full and equal access, and (b) he learned of Post's policies deprioritizing accessibility, which experiences deter Mr. Giannaros from joining Post's community, where he feels like a second-class citizen.

---

[9] *Id.*

[10] "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there." *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287, 294 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F. Supp. 3d 296 (D. Mass. 2018) (same).

13. Venue is proper under 28 U.S.C. § 1391(b)(2) because this is the District in which a substantial part of the acts and omissions giving rise to Mr. Giannaros's claims occurred.

## PARTIES

14. Mr. Giannaros is a natural person over the age of 18. He resides in and is a citizen of Essex County.

15. Mr. Giannaros works for the Commonwealth as a Senior Vocational Rehabilitation Counselor, helping Massachusetts residents with disabilities develop plans for employment.

16. Because Mr. Giannaros has very little usable sight, he relies on screen reader auxiliary aids to access digital information. A screen reader describes verbally what appears on a screen so that users with a visual disability can perceive, understand, and operate digital content, like a text message, Microsoft Word document, or website.

17. The Honorable William G. Young of the United States District Court for the District of Massachusetts previously appointed Mr. Giannaros to represent a nationwide class of screen reader users in a case asserting similar discrimination claims against an ecommerce retailer. *Giannaros v. Poly-Wood, LLC*, No. 1:22-cv-10351-WGY, Doc. 45, p. 2 (D. Mass. Oct. 27, 2022).

18. Post owns, operates, and/or controls https://post.news/, a digital platform where consumers may access, pay for, and discuss news and other information.

19. Post is responsible for the policies, practices, and procedures concerning its platform's development and maintenance.

## STANDING UP FOR TITLE III OF THE ADA

20. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited

access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[11]

21.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General and private individuals to sue, but the rate at which [] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[12]

22.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA," most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[13]

23.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[14]

24.     Courts recognize this dynamic too.

> [Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly

---

[11] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[12] *Id.*
[13] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010) (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007); and *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008)).
[14] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement[.]").

by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[15]

25.     Consistent with these policies, Mr. Giannaros files this case to ensure Post provides full and equal access to consumers with disabilities.

## SUBSTANTIVE ALLEGATIONS

### Post's Accessibility Policies and Inaccessible Platform

26.     Post owns, operates, developed, procured, maintains and/or uses https://post.news/ for the purpose of providing its services to consumers across the internet through computers, smartphones, and other mobile devices.

27.     As described above, Post's policies and practices are "not focused on things like . . . accessibility." Instead, Post has chosen to "not be[] fully accessible" and to "invest in accessibility when [Post] can."

28.     It is no surprise then that Mr. Giannaros is unable, and will continue to be unable, to fully and equally access and enjoy much of the content and services at https://post.news/.

29.     To this end, as a result of attempting to access the platform, and from usability testing performed on his behalf, Mr. Giannaros found that he cannot fully and equally access https://post.news/ with VoiceOver, the screen reader auxiliary aid he utilizes to access digital content from his mobile phone. For example:

(a)     Post prevents screen reader users from accessing some primary content. For example, before accessing Post's online community, products, and services, users must complete Post's signup process. To begin this process, users must click a Sign Up button on the

---

[15] *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.).

https://post.news/ homepage. After clicking this button, Post displays a pop-up window on the screen. When Mr. Giannaros first attempted to access https://post.news/, Post invited users to "Sign up for the Waitlist." Unfortunately, because Post chose to "not be fully accessible," screen reader users could not tab to the pop-up window. Instead, their screen reader remained stuck on the underlying page. As a result, screen reader users, including Mr. Giannaros, were unlikely or unable to complete the signup process independently. This barrier prevented Mr. Giannaros and other screen reader users from joining Post's community and contributed to the very sense of isolation and stigma the ADA was intended to eliminate. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/tCGK5ApuIaE.

(b)   Post has eliminated the Waitlist that existed when Mr. Giannaros first attempted to join Post's community. Now, when users click the Sign Up button, Post displays a pop-up window requesting the users' Display Name, Handle, Email, and Password. It is inevitable that, on occasion, users will be unsuccessful in submitting this information. Fortunately, when this occurs, Post provides informative error messages, redirecting users to the form fields with missing or invalid information. Users who perceive content visually can scroll up the page to provide the missing or invalid information featured by the error messages. Unfortunately, because Post chose to "not be fully accessible," Post fails to similarly redirect screen reader users to these error messages. As a result, screen reader users, like Mr. Giannaros, are less likely to resolve errors during the sign-up process and join Post's growing community. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/FI0b2OTpggE.

(c)   In the event a screen reader user were able to complete the signup process and login successfully, they would have an opportunity to read, share, react to, comment on, and pay for content created by other Post users, like Reuters. Post displays this content on users' profile

8

pages, where visitors can scroll down to access older posts. Unfortunately, screen reader users, like Mr. Giannaros, cannot tab to these posts because screen readers become stuck before reaching content further down the page. As a result, in this example, screen reader users cannot tab to stories concerning Blackstone limiting redemptions from its $69 billion REIT, a massacre in the Democratic Republic of Congo, and Germany's disappointing failure to advance beyond group play in the World Cup. Click the following link to view a short video demonstrating this access barrier: https://youtu.be/H0c0gQrS2C4.

    (d) Post users can create and publish original content. Users who perceive content visually will notice a floating button on the right side of their screen and understand that by clicking the button, Post will allow them to create and publish a piece of content to their newsfeed, similar to Twitter or Facebook. However, unlike those platforms, Post empowers users to generate revenue from the content they create (a) by putting their content behind a paywall and requiring other users to pay for access, or (b) through tips from appreciative users. Unfortunately, because Post chose to "not be fully accessible," screen reader users, like Mr. Giannaros, cannot tab to this floating button. Instead, their screen reader remains stuck on the underlying page, scrolling through the content of their newsfeed in perpetuity. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/nuP0UesoxB8.

    (e) Post fails to describe the purpose of some links and buttons. As a result, screen reader users have difficulty understanding what information is contained on pages and how that information is organized. When link and button labels are clear and descriptive, screen reader users can find information they seek more easily, and they can understand the relationships between different pieces of content. For example, Post enables users to comment on other users' posts. Users can include text, GIFs, or pictures in their comments. To this end, users who perceive

content visually will notice a button in the shape of a camera and understand that by clicking this camera-shaped button, Post will enable them to upload a picture from their phone or computer. Unfortunately, because Post chose to "not be fully accessible," this button is not labeled with sufficiently descriptive alternative text. As a result, screen reader users, like Mr. Giannaros, are likely to skip over the button without perceiving, much less understanding, the opportunity it presents. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/F25AJAYB3q4.

### Mr. Giannaros's Injury

30. The access barriers described above, and others, deny Mr. Giannaros full and equal access to https://post.news/ today.

31. These barriers, together with Post's policies excluding potential users with disabilities, humiliate and deter Mr. Giannaros from joining Post's online community, where he cannot help but feel like a second-class participant, in the future.

32. Still, Mr. Giannaros intends to attempt to access Post's platform within the next six months to determine if it is accessible and, if so, to potentially explore the community, information, and services Post offers at that time.

### Post Received Fair Notice of its ADA Obligations

33. The DOJ announced that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator

Tom Harkin regarding the accessibility of websites.[16] Since then, DOJ has "repeatedly affirmed the application of [T]itle III to Web sites of public accommodations."[17]

34. In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[18]

35. In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity's "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off its physical premises.[19]

36. In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website was inaccessible to some individuals with disabilities.[20]

37. In a 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that: "[t]he Department first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods,

---

[16] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), https://www.justice.gov/crt/foia/file/666366/download.

[17] 75 Fed. Reg. 43460-01, 43464 (July 26, 2010).

[18] Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[19] Brief for the United States in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf.

[20] *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), https://www.justice.gov/file/163956/download.

services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities."[21]

38. In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that Title III covers websites and mobile applications.[22]

39. In 2022, DOJ published "Guidance on Web Accessibility and the ADA," reiterating that DOJ "has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."[23]

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

40. The assertions contained in the previous paragraphs are incorporated by reference.

41. Mr. Giannaros is an individual with a "disability." With respect to an individual, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). The ADA defines "major life activities" to include, in relevant part, "seeing[.]" 42 U.S.C. § 12102(2)(A). Because Mr. Giannaros has very little usable sight, he meets Title III's definition of an individual with a disability.

42. Post operates a place of public accommodation under Title III. Title III defines a "public accommodation" as including a "place of public gathering[.]" 42 U.S.C. § 12181(7)(D).

---

[21] *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf.
[22] *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (No. 18-1539).
[23] Civil Rights Division, Department of Justice, *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022), https://beta.ada.gov/resources/web-guidance/.

Because Post is a town square for civil debate, learning, and conversation, it meets Title III's definition of a place of public accommodation.

43. Title III begins with a general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

44. The statute contains several general prohibitions, including a prohibition against "denying an individual on the basis of a disability 'the opportunity . . . to participate in or benefit from the goods [or] services' of a public accommodation." 42 U.S.C. § 12182(b)(1)(A)(i).

45. These general prohibitions are supplemented by several specific prohibitions, including an auxiliary aids and services requirement, which requires public accommodations to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

46. The United States Department of Justice ("DOJ") has issued regulations implementing the ADA, including the auxiliary aid and service requirement.

47. These regulations define "screen reader software," like what Mr. Giannaros used to attempt to access https://post.news/, as being a covered "auxiliary aid and service." 28 C.F.R. § 36.303(b)(2).

48. The regulations also include an effective communication requirement, which requires public accommodations to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

49.     DOJ has issued regulatory guidance noting that the duty to provide effective communication with customers is implicit in the duty of a public accommodation to provide auxiliary aids and services. Appx. A to Part 36 - Guidance on Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities.[24]

50.     DOJ also has issued a Technical Assistance Publication, which provides guidance on communicating effectively with individuals who have vision, hearing, or speech disabilities. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 2014).[25] This publication requires the provision of "information technology that is accessible (either independently or through assistive technology such as screen readers)." *Id*.

51.     Post has violated Title III's general anti-discrimination mandate and effective communication requirement by failing to ensure https://post.news/ is fully and equally accessible through screen reader auxiliary aids.

52.     This unequal access, together with Post's policies promoting it, also humiliate and deter Mr. Giannaros from joining Post's online community, forcing him to wait on the sideline, for some unspecified amount of time, until Post elects to retrofit https://post.news/ to be accessible.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Giannaros requests judgment as follows:

(A)     A declaratory judgment that at the commencement of this action Post was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Post took no action that was reasonably calculated

---

[24] This guidance is available at https://www.ecfr.gov/current/title-28/chapter-I/part-36/appendix-Appendix%20A%20to%20Part%2036 (last visited Feb. 6, 2023).
[25] This guidance is available at http://www.ada.gov/effective-comm.htm (last visited Feb. 6, 2023).

to ensure Mr. Giannaros could fully, equally, and independently access Post's online community, content, and services;

(B)   A permanent injunction, pursuant to 42 U.S.C. § 12188(a)(2) and 28 C.F.R. § 36.504(a), which directs Post to take all steps necessary to ensure its products and services are fully, equally, and independently accessible to Mr. Giannaros, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Post has adopted and is following policies and practices that will cause Post to remain in compliance with the law;

(C)   Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)   Payment of costs of suit;

(E)   Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, including costs of monitoring Post's compliance with the judgment;

(F)   Whatever other relief the Court deems just, equitable, and appropriate; and

(G)   An order retaining jurisdiction over this case until Post has complied with the Court's orders.

| | |
|---|---|
| Dated: February 6, 2023 | */s/ Jason M. Leviton* |
| | Jason M. Leviton (BBO# 678331) |
| | **BLOCK & LEVITON LLP** |
| | 260 Franklin Street, Suite 1860 |
| | Boston, MA 02110 |
| | Phone: (617) 398-5600 |
| | jason@blockleviton.com |
| | |
| | Kevin W. Tucker (*pro hac vice* forthcoming) |
| | Kevin J. Abramowicz (*pro hac vice* forthcoming) |
| | H. Chandler Steiger (*pro hac vice* forthcoming) |
| | Stephanie M. Moore (*pro hac vice* forthcoming) |
| | **EAST END TRIAL GROUP LLC** |
| | 6901 Lynn Way, Suite 215 |

Pittsburgh, PA 15208
Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com

16